## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JTH TAX LLC d/b/a LIBERTY TAX SERVICE, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> TEMEYKA ODESSA SCOTT, an individual, <br><br> Defendant. | Case No.: 3:25-cv-13908-SAL <br><br> **VERIFIED COMPLAINT** |

Plaintiff JTH Tax LLC d/b/a Liberty Tax Service ("Plaintiff" or "Liberty"), by and through undersigned counsel, alleges for its Verified Complaint against Defendant Temeyka Odessa Scott ("Defendant" or "Scott"), as follows:

### PRELIMINARY STATEMENT

1.      This action arises from a deliberate and brazen theft of Liberty's property, confidential information, proprietary data, and taxpayer records by a terminated former Liberty franchisee who returned to a Liberty office she no longer controlled, apparently used a void lease to deceive a locksmith into changing the locks, broke in, stole nearly everything inside the facility, and disappeared with thousands of pages of taxpayer identities and financial records.

2.      On December 2, 2025, Scott—a terminated former franchisee with no rights of access to the premises or to any Liberty property—executed a calculated removal of computers, monitors, printers, routers, scanners, cables, phones, furniture, keys, filing cabinet locks, customer records, and thousands of pages of confidential tax information from Liberty's Garners Ferry Road location.

3.      Scott gained entry through deception. Upon information and belief, she presented a locksmith with an obsolete, superseded lease while concealing Liberty's fully executed assumption

of the lease, which expressly vested Liberty with all tenancy rights. She had no legal right to enter, to change the locks, or to remove any property.

4.    This was not the first incident. On November 19, 2025, Scott was discovered by the incoming franchise operator removing items from the office, including computers, customer files, keys, filing cabinets, scanners, and other equipment.

5.    When the incoming operator walked in that day, she found Scott mid-removal. Scott claimed she was only removing her personal items, but that was false. The items visible in her vehicle—computers, monitors, boxes, network hardware, and office equipment—were unmistakably corporate property. Police were called, and officers required Scott to return all items she had loaded into her car. But the misconduct escalated.

6.    Later that same day, the new operator discovered that customer files were missing and contacted the police to file an official report. Three large black storage bins that previously held customer files were empty, and stacks of files in the office had been disturbed and were no longer in their original order.

7.    Undeterred, Scott returned on December 2, 2025. When the new operator arrived, the locks had been changed and the office had been stripped bare. Every desk, computer, cable, filing cabinet, and customer file was gone. The scene resembled a burglary, except the perpetrator was a former franchisee who knew exactly where everything was and how to remove it quickly.

8.    Scott's conduct was not a misunderstanding. It was willful, deceptive, and retaliatory following her lawful termination as a Liberty franchisee on August 25, 2025, for chronic non-payment and operational violations. Liberty brings this action for violations of the Defend Trade Secrets Act and the Computer Fraud and Abuse Act, and state law claims for conversion, trespass, and breach of post-termination covenants in her franchise agreement.

9.    Most seriously, Scott absconded with highly sensitive taxpayer information—including Social Security numbers, income records, banking information, W-2s, 1099s, prior-year returns, and identity documents—in violation of federal and state privacy laws, IRS Publication 4557, and her post-termination obligations requiring immediate delivery of all customer files.

10.    Liberty seeks immediate and permanent injunctive relief to halt Scott's ongoing misconduct, recover its property, and protect the confidentiality of its trade secrets and customer data. Scott's actions have caused irreparable harm to Liberty's goodwill, customer trust, and operational integrity. Because Scott is in bankruptcy and Liberty is stayed from pursuing monetary relief, this action is limited to non-monetary and equitable relief, including enforcement of Liberty's contractual and statutory rights.[1]

## PARTIES

11.    Plaintiff Liberty is a Delaware limited liability company with its principal place of business at 2378 Liberty Way, Virginia Beach, Virginia 23456.

12.    Defendant Scott is an adult individual residing in Hopkins, South Carolina, and is a former Liberty Tax franchise owner.

## JURISDICTION AND VENUE

13.    This Court has personal jurisdiction over Scott pursuant to Fed. R. Civ. P. 4(k)(1)(A) because she resides in South Carolina and is subject to the jurisdiction of South Carolina courts. Her

---

[1] Liberty seeks only non-monetary relief in this action—including injunctive relief and replevin—because Scott is a debtor in a pending Chapter 13 bankruptcy case, *In re Temeyka Odessa Scott*, Case No. 25-04097-jd (Bankr. D.S.C. filed Oct. 22, 2025), and any claim for damages against her bankruptcy estate is stayed by 11 U.S.C. § 362(a). Liberty's claims against Scott personally, however, are not stayed under 11 U.S.C. § 362(c)(3)(A), because she filed an earlier Chapter 13 case within the preceding year, Case No. 24-04457-jd (filed Dec. 13, 2024, dismissed Aug. 4, 2025), and thus the automatic stay in the current case terminated "with respect to the debtor" 30 days after the October 22, 2025 petition date.

conduct also occurred within this District.

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Liberty's claims arise under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

15.     The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal claims.

16.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b) because Defendant resides in South Carolina and a substantial part of the events giving rise to the claims occurred in this District, including the theft of Liberty's property from its Garners Ferry Road office in Columbia, South Carolina.

## FACTUAL BACKGROUND

### A.     The Liberty Franchise System

17.     Liberty operates a nationwide system of franchised tax preparation offices under the Liberty Tax Service® brand. It enters into written franchise agreements with independent operators who are authorized to offer tax preparation services using Liberty's business model and tools.

18.     Through these agreements, Liberty provides franchisees with access to proprietary resources, including but not limited to its Operations Manual, business methods, customer records and data, and marketing strategies (collectively, the "Confidential Information").

19.     Franchisees agree to maintain the confidentiality of Liberty's Confidential Information and to return all such materials upon termination, expiration, or nonrenewal of the franchise relationship.

20.     The Franchise Agreement also imposes covenants restricting competition and customer solicitation during the term of the franchise and for a specified period following termination.

21.     Liberty has invested heavily in developing and supporting its franchise system, including standardized procedures, training programs, technology infrastructure, and compliance protocols.

22.     As a result of these efforts, Liberty has built a substantial presence in the tax preparation industry and maintains an extensive network of franchise offices across the United States.

B.    **Scott's Operation of Liberty Franchises**

23.     At relevant times, Scott owned and operated one or more Liberty Tax franchise locations in South Carolina pursuant to franchise agreements with Liberty.

24.     On or about August 28, 2018, Scott entered into franchise agreements with Liberty for franchise territories known as SC015 (Aikens SC-2) and SC146 (Leesville SC-1), both of which were renewed in June 2023 for additional five-year terms pursuant to renewal amendments.

25.     On August 9, 2020, Scott entered into franchise agreements with Liberty for franchise territories known as SC041 (Columbia) and SC045 (West Columbia), both of which were renewed on September 5, 2024 for five-year terms through May 31, 2029.

26.     The terms of Scott's franchise agreements are substantially similar, and are collectively referred to herein as the "Franchise Agreement." A true and correct copy of the 2024 franchise agreement for the SC041 territory is attached hereto as Exhibit A.

27.     The Franchise Agreement granted Scott a license to use Liberty's Confidential Information, identify as a Liberty franchise, and learn the ins and outs of Liberty's operation, marketing, and business systems.

28.     Among other locations, Scott operated a Liberty franchise office at 7509 Garners Ferry Road in Columbia, South Carolina ("the Garners Ferry Location"), which falls within the SC041 territory and is central to this dispute.

5

C.     **Obligations Under the Franchise Agreement**

29.     As a condition of being a Liberty franchisee, Scott agreed to various covenants designed to protect Liberty's Confidential Information and proprietary business model during and after the term of the Franchise Agreement. *See* Ex. A §§ 9–10, 12(d).

30.     The Franchise Agreement required Scott to maintain the secrecy of Liberty's Confidential Information—defined as including, but not limited to "the components of the Liberty system, the information comprising the Manual, information obtained from or relating to clients served by the Franchised Business or any Liberty franchisee, marketing information, directives, know-how, techniques, materials, data, and other information shared with or made available by Liberty"—both during and after the term of the franchise. *Id.* § 12(a).

31.     The Franchise Agreement also imposed clear post-termination obligations on Scott. Upon termination, she was required, among other things, to: (1) deliver to Liberty all customer lists and contact information, tax returns, files, and records; (2) return Liberty's confidential Operations Manual; (3) permanently cease using any of Liberty's Confidential Information; and (4) adhere to the Franchise Agreement's post-term covenants, including covenants not to compete and not to solicit. *Id.* §§ 9(g)–(i), 12(c)–(d).

32.     Scott further agreed that she would pay Liberty all amounts owing upon termination, and that if termination resulted from her default, Liberty would be entitled to recover its damages, costs, and expenses (including reasonable attorneys' fees), and would have a lien against any and all of her personal property, furnishings, equipment, fixtures, and inventory used in the operation of the franchised business. *Id.* § 9(d).

33.     Under Section 10(b), Scott agreed that for two years following termination, she would not directly or indirectly prepare or electronically file income tax returns for a fee within her former

Liberty territory or within a 25-mile radius. *Id.* § 10(b).

34.     Section 10(d) imposed a two-year post-termination non-solicitation covenant, under which Scott agreed not to solicit any person or entity served by her former Liberty offices in the preceding twelve months for the purpose of offering tax preparation, e-filing, or financial products. *Id.* § 10(d).

35.     Under Section 10(i), Scott further agreed "not to do any act that is, in Liberty's determination, harmful, prejudicial or injurious to Liberty . . .." *Id.* § 10(i).

36.     The restrictive covenants in the Franchise Agreement are designed to protect Liberty's legitimate, legal protectable business interests, including: (a) preserving customer relationships and loyalty; (b) protecting Liberty's goodwill and brand; (c) maintaining the confidentiality of customer data and business information; (d) supporting continued franchise operations; and (e) preventing irreparable harm.

37.     In Section 10(l), Scott expressly acknowledged that the restrictions in Section 10 are reasonable, valid, and not contrary to public interest. *Id.* § 10(l). She further waived any defenses to their strict enforcement and agreed that, in the event of breach, Liberty would be entitled to injunctive relief, including a TRO and preliminary and permanent injunction, without any requirement to post a bond. *Id.* § 10(k).

38.     Scott further agreed in Section 10(m) that all covenants in Section 10 would survive termination or expiration of the Franchise Agreement. *Id.* § 10(m).

39.     Under Section 12(b), Scott expressly agreed not to divulge or use Liberty's Confidential Information for her own benefit or for any third party, except as authorized by the Franchise Agreement or with Liberty's prior written consent. She further acknowledged that these confidentiality obligations would survive termination of the Franchise Agreement and remain binding

thereafter. *Id.* § 12(b), (d).

40.     Section 12(a) defines Confidential Information broadly to include Liberty's "the components of the Liberty system, the information comprising the Manual, information obtained from or relating to clients served by the Franchised Business or any Liberty franchisee, marketing information, directives, know-how, techniques, materials, data." *Id.* § 12(a).

41.     Under Section 12(d), Scott agreed to use Confidential Information solely for operating the Liberty franchise and to adopt reasonable procedures to prevent its unauthorized use or disclosure. *Id.* § 12(d).

42.     She further acknowledged under Section 12(c) that using or duplicating Confidential Information outside of the franchise relationship would constitute "an unfair method of competition." *Id.* § 12(c).

43.     Finally, the Franchise Agreement includes a choice-of-law clause stating that Virginia law "governs all claims that in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto . . . ." *Id.* § 18(a).

**D.     Termination of Scott's Franchise Agreement**

44.     By letter dated August 25, 2025 (the "Termination Letter"), Liberty formally terminated all of Scott's franchise rights for cause, pursuant to Sections 8.c(i) and 8.c(ii) of her Franchise Agreements, due to her chronic failure to pay outstanding financial obligations and to comply with operational requirements. A true and correct copy of the Termination Letter is attached hereto as Exhibit B.

45.     At the time of her termination, Scott owed approximately $75,000 in past-due royalties to Liberty, which she has failed and refused to pay.

46.     The Termination Letter stated that Scott was required to immediately comply with

her post-termination obligations, including: (a) ceasing use of Liberty's Confidential Information and trade secrets; (b) delivering to Liberty all customer lists, tax returns, files, and records, including by retaining all records for the Garners Ferry Location at that location; (c) assigning her interest in any leases for the franchises business, including the Garners Ferry Location; (d) adhering to the post-termination covenants, including the covenants not to compete and not to solicit in the Franchise Agreements; and (e) providing to Liberty all equipment, signs, trade fixtures, and furnishings used in the franchised business. *See* Ex. B.

47.     Liberty subsequently paid Scott's landlord $6,814.17 in past-due rent and assumed Scott's lease for the Garners Ferry Location (the "Lease Assumption"). A true and correct copy of the Lease Assumption is attached hereto as Exhibit C.

48.     In light of Scott's termination for default and her failure to pay amounts due (including approximately $75,000 in past-due royalties), Liberty's rights included a lien against the personal property, furnishings, equipment, fixtures, and inventory used in the franchised business— including the computers and other items located at the Garners Ferry Location—and Liberty further secured its rights to the property therein through the Lease Assumption.

49.     In or about October 2025, Liberty assigned a new operator to the Garners Ferry Location and the locks to the front entrance were changed to secure the premises. However, only the front door was rekeyed, inadvertently leaving other access points unsecured and enabling Scott's re-entry.

50.     Under the Franchise Agreement, Scott was also required to assist Liberty in securing uninterrupted use of the Garners Ferry Location. *See id.* § 10(f). However, as detailed below, Scott violated that obligation by reentering the Garners Ferry Location without authorization, seizing property, and unlawfully retaining Liberty's customer files and proprietary information.

**E.**     **Scott's Unlawful Conduct – Break-In and Theft of Confidential Information and Equipment**

51.     Instead of complying with her post-termination obligations, Scott repeatedly and unlawfully returned to the Garners Ferry Location to remove Liberty's property and confidential records.

52.     On November 19, 2025, the incoming Garners Ferry franchise operator unexpectedly discovered Scott inside the office, mid-removal, loading computers, keys, customer files, filing cabinets, scanners, and other equipment into her vehicle.

53.     When confronted, Scott falsely claimed she was only removing her personal items. But the items visible in her car—computers, monitors, network hardware, and Liberty's other business property—were plainly not personal. Police were called to the scene, and officers directed Scott to return the items she had removed before she left the location.

54.     Later that same day, the incoming operator noticed that multiple customer files were missing. Three large black storage bins that had previously contained client records were empty. Police were again contacted, and an official report was filed. The incident report identified Scott as the suspect and reflected that "case files" were stolen. Despite law enforcement's intervention, Scott did not stop.

55.     On December 2, 2025, the incoming operator arrived to find that the locks had been changed and the Garners Ferry Location had been stripped bare. Furniture, electronics, filing cabinets, and thousands of confidential customer files had been removed.

56.     The following photographs show the Garners Ferry office and file storage area before and after Scott's unlawful break-in and theft of Liberty's property:

10

Before:

After:






57.     Upon information and belief, Scott had presented a void and superseded lease to a locksmith while concealing Liberty's valid lease assumption agreement and tenancy rights, in order to deceive the locksmith into changing the locks and facilitating Scott's unauthorized access to the Garners Ferry Location.

58.     The Columbia Police Department investigated the December 2, 2025 incident as a commercial burglary. The police report confirms that forced entry occurred and that virtually all remaining business assets had been removed from the premises. A true and correct copy of the police report for the December 2, 2025 incident is attached hereto as Exhibit D.

59.     The stolen property included six computers, five desks, five printers, ten chairs, two scanners, one tv, four tables, two fans, and an estimated 3,400 individual tax files containing personal identifying information, prior-year returns, W-2s, 1099s, and other confidential

documents. The estimated value of the physical items is listed in the police report as $14,000. That figure does not account for the substantial intangible value of Liberty's customer and other Confidential Information, which constitute a core asset of Liberty's business.

60.     Liberty's internal investigation confirmed that both physical and electronic customer records were among the stolen property. These records are protected under federal and state privacy laws and constitute Liberty's trade secrets. They are not publicly available, and their value lies in their confidentiality and use within Liberty's proprietary business model. Scott's actions not only deprived Liberty of vital business assets but also jeopardized the security of thousands of taxpayer identities.

61.     Upon information and belief, Scott's intent was to retain Liberty's client data for use in direct competition with Liberty. She now possesses detailed financial and contact information for nearly every customer previously served at the Garners Ferry Location. Her conduct constitutes a direct breach of her post-termination confidentiality covenants and anticipatory breach of her non-compete and non-solicitation covenants, along with violations of federal and state law.

62.     Liberty has no adequate remedy at law for this ongoing harm. The damage to Liberty's goodwill, the threat of customer diversion, loss of control over Confidential Information, business disruption, and the risk of misuse or disclosure of sensitive data cannot be fully redressed through monetary compensation. Liberty therefore seeks immediate injunctive and equitable relief to recover its property, protect its confidential information, and enforce the contractual and legal obligations that Scott has willfully and repeatedly violated.

## COUNT I
### *Violation of the Defend Trade Secrets Act*
(18 U.S.C. § 1836)

63.     Liberty incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

12

64.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), provides a private right of action for the misappropriation of trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

65.     Liberty owns numerous trade secrets, including but not limited to: customer lists and contact information; historical tax return data; pricing and promotional histories; its Operations Manual and training programs; marketing strategies; proprietary methods of operation; and access credentials for Liberty systems.

66.     These trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, others who could profit from their disclosure or use.

67.     Liberty takes extensive steps to maintain the secrecy of its trade secrets, including confidentiality clauses in all franchise agreements, password-protected systems, tiered access protocols, compliance with DOJ and IRS safeguards, and physical access restrictions to customer records and equipment.

68.     Liberty's customer lists, files, and business systems provide a substantial competitive advantage in the tax preparation market. Competitors could exploit this information to solicit Liberty customers and replicate Liberty's business model.

69.     The customer files and data Scott removed from the Garners Ferry Location included confidential taxpayer histories, contact information, records of service, and other sensitive identifying and financial information protected by federal and state law.

70.     Scott's acquisition and retention of these trade secrets following the termination of her franchise was unauthorized and in direct violation of her contractual and legal obligations.

71.     Scott misappropriated Liberty's trade secrets by: (a) physically removing paper client files; (b) removing computers and storage devices containing electronic data; and (c) retaining that information for use in a competing venture and to deprive Liberty of its use.

72.     Her misappropriation was willful, malicious, and knowing. Scott had full knowledge of her confidentiality obligations, and her actions were taken with the intent to harm Liberty and benefit herself or a competing business.

73.     As a direct and proximate result of Scott's conduct, Liberty has suffered and continues to suffer harm, including the costs of investigating the breach, assessing data exposure, securing affected systems, and mitigating reputational damage. Liberty has also lost control of highly sensitive and proprietary client information.

74.     The misappropriated information is used in interstate commerce. Tax returns prepared at Liberty offices—including those at the Garners Ferry Location—are electronically filed with the IRS across state lines. Additionally, Liberty disseminates its trade secrets from its Virginia headquarters to franchisees throughout the United States, including to Scott in South Carolina.

75.     Liberty's Operations Manual and other Confidential Information are used in the daily operation of Liberty franchises nationwide and are central to Liberty's franchise system.

76.     Pursuant to 18 U.S.C. § 1836(b)(3)(A), Liberty is entitled to an injunction prohibiting Scott from using, disclosing, retaining, or benefiting from its misappropriated trade secrets, and requiring her to return all such information and property to Liberty.

77.     Liberty also seeks the preservation of all evidence and an order prohibiting Scott from deleting, destroying, or transferring any customer data or other materials containing Liberty's trade secrets.

78.     In addition, Liberty is entitled to the civil seizure of its misappropriated property

under 18 U.S.C. § 1836(b)(2), including its customer files, records, and confidential business information that Scott failed to return as required under Section 9 of the Franchise Agreement.

79.    Although Liberty reserves the right to seek exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(B)–(D), it does not seek monetary relief at this time due to the automatic stay in Scott's bankruptcy proceeding. Liberty seeks only equitable and injunctive relief to prevent further irreparable harm.

## COUNT II
### *Computer Fraud and Abuse Act*
(18 U.S.C. § 1030)

80.    Liberty incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

81.    The computer systems used at the Garners Ferry Location are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B), as they were used in and affected interstate commerce and were connected to networks that transmitted tax returns and data across state lines.

82.    These protected systems were used to prepare and electronically file tax returns with the IRS and state authorities, transmit sensitive client data, access Liberty's cloud-based software, and maintain Liberty's confidential records and operational tools.

83.    Upon termination of her franchise, Scott was expressly prohibited from accessing or using Liberty's computers, software, login credentials, or customer data.

84.    By physically removing computers and storage devices from the Garners Ferry Location, Scott knowingly and intentionally accessed or caused to be accessed protected computers without authorization, and obtained data and records stored therein.

85.    Scott's unauthorized access and acquisition of Liberty's data violated 18 U.S.C. § 1030(a)(2)(C), which prohibits obtaining information from a protected computer without authorization or in excess of authorization.

86.     Her conduct further violated 18 U.S.C. § 1030(a)(5)(B) and (C), which prohibit intentionally accessing a protected computer without authorization and recklessly and otherwise causing damage or loss. Liberty lost access to the data, incurred costs to investigate the breach, and was required to restore or replace compromised systems.

87.     As a result of Scott's violations, Liberty suffered "loss" within the meaning of 18 U.S.C. § 1030(e)(11), including: (a) the cost of responding to the offense and assessing the damage to its systems and data; (b) expenses incurred to restore affected systems, devices, and information to their prior condition; and (c) consequential losses resulting from disruption to Liberty's operations and interruption of business services.

88.     The aggregate loss attributable to Scott's conduct exceeds $5,000 within a one-year period, satisfying the jurisdictional threshold under § 1030(c)(4)(A)(i)(I).

89.     Liberty is entitled to equitable relief under 18 U.S.C. § 1030(g), including an injunction prohibiting Scott from using, copying, or accessing Liberty's electronically stored information, and compelling her to return all stolen computer equipment and data, including any physical or digital media containing Liberty's information.

90.     Liberty also seeks an order requiring the preservation of any such devices, data, or cloud accounts to prevent spoliation and to safeguard the integrity of the evidence and trade secrets at issue.

91.     In light of Scott's unauthorized access and retention of Liberty's systems and data, immediate equitable relief is necessary to protect Liberty's ongoing operations and client privacy. Liberty does not seek monetary relief at this time due to the automatic stay in bankruptcy, but reserves the right to seek damages and attorneys' fees if permitted.

## COUNT III
### *Breach of the Franchise Agreement*
### *(Equitable Claim)*

92.     Liberty incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

93.     The Franchise Agreement between Liberty and Scott is a valid and enforceable contract. Liberty has performed all material obligations required of it under the agreement.

94.     Under the Franchise Agreement, Scott agreed to abide by various post-termination obligations and covenants, including the return of Liberty's property and the protection of Liberty's Confidential Information. *See* Ex. A §§ 9–10, 12.

95.     Specifically, Scott agreed to: (a) refrain from using or disclosing Liberty's Confidential Information; (b) deliver to Liberty all copies of customer lists, tax returns, files, and records; (c) return Liberty's confidential Operations Manual; (d) comply with non-competition and non-solicitation covenants for two years following termination; (e) cease any conduct deemed harmful or prejudicial to Liberty's business; and (f) assist Liberty in obtaining uninterrupted access to her former franchise office and related business assets. *See id.* §§ 9(g)–(i), (k), 10(b), (d), (i), (f), 12(b).

96.     Sections 12 of the Franchise Agreement prohibits the use of Liberty's Confidential Information for any purpose other than the operation of the franchised business and impose continuing obligations of confidentiality even after termination. *See id.* § 12.

97.     Scott materially breached these obligations by failing to return Liberty's customer records, tax files, computers, and operational materials, and by retaining access to and control over Liberty's proprietary data and equipment after termination.

98.     Upon information and belief, Scott has used or intends to use Liberty's Confidential Information, including customer identities, contact details, and service histories, to solicit former

17

customers and compete in the tax preparation business, either directly or indirectly.

99.     These actions violate Sections 9, 10, and 12 of the Franchise Agreement, including the non-disclosure, non-solicitation, and non-competition covenants.

100.     Scott's retention of Liberty's confidential records and proprietary systems, coupled with her failure to return customer files, equipment, and other materials, constitutes a continuing breach of the Franchise Agreement. Upon information and belief, Scott intends to use, or is preparing to use, Liberty's Confidential Information in a competing business in violation of her contractual obligations.

101.     As a direct and proximate result of Scott's breaches, Liberty has suffered and will continue to suffer substantial harm, including: (a) loss of customer goodwill and loyalty; (b) loss of revenue and customer relationships; (c) loss of franchisee system stability; (d) loss of ability to resell or transfer franchise territories; (e) loss of competitive advantage; and (f) loss of control over its confidential business information.

102.     The damages caused by Scott's ongoing and anticipated conduct are not readily compensable by money damages alone. The nature of the harm, including the erosion of customer trust and misuse of confidential tax data, warrants equitable relief.

103.     The Franchise Agreement expressly recognizes that any breach of its post-termination covenants, including the non-compete and confidentiality clauses, constitutes irreparable harm. Scott agreed that Liberty would be entitled to injunctive relief in the event of such breaches. *See id.* §§ 10(k), 18(g)

104.     Unless Scott is enjoined, she will continue to breach the Franchise Agreement, further disseminate Liberty's Confidential Information, and unfairly compete against Liberty in violation of her contractual duties.

## COUNT IV
### *Common Law Conversion*

105.    Liberty incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

106.    Pursuant to the Franchise Agreement and post-termination obligations, Liberty is entitled to immediate possession of specific tangible property, including: (a) all copies, including electronic and cloud based copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the franchised business; (b) all copies, including electronic and cloud based copies and media, containing customer tax returns, files, and records; and (c) all personal property, furnishing, equipment, fixtures and inventory owned by Franchisee and used in the operation of the Franchised Business. *See* Ex. A, §§ 9 (g), and (h).

107.    Scott was permitted to use these items solely in connection with her operation of a Liberty Tax franchise. Upon termination of the Franchise Agreement, all such rights ceased.

108.    Under Section 9 of the Franchise Agreement and the Termination Letter, Scott was required to immediately return or transfer possession of all such property to Liberty. She was specifically instructed to deliver customer records, return equipment, and cease all use of Liberty's materials.

109.    As of the filing of this Complaint, Scott remains in possession of the above-described property, including but not limited to computers, customer files, office equipment, and furnishing, and continues to exercise control over them without Liberty's consent and in contravention to her contractual obligation.

110.    Scott's continued possession of Liberty's property is unauthorized and substantially interferes with Liberty's immediate right to possess and use those assets.

111.    Scott's conduct constitutes common law conversion under Virginia or South

Carolina law.

112.     Upon information and belief, Scott has retained these items for her own use and benefit and in willful violation of her post-termination obligations under the Franchise Agreement.

113.     Liberty does not seek monetary damages for this count at this time. Instead, it seeks the immediate return of all converted property listed above.

114.     Liberty also seeks injunctive relief prohibiting Scott from using, transferring, copying, or destroying any of Liberty's customer records or property until it is returned in full.

115.     Unless the Court intervenes, Scott's continued possession and control over Liberty's property will cause ongoing and irreparable harm to Liberty's operations, compliance obligations, and franchise system integrity.

## COUNT V
### *Trespass*

116.     Liberty incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

117.     Under the Franchise Agreement and its lease assumption, Liberty holds the right to exclusive possession and control of the Garners Ferry Location. *See* Ex. C.

118.     Upon termination of Scott's franchise on August 25, 2025, all of her rights to access or occupy the Garners Ferry Location ceased. Liberty assumed the lease, paid the past-due rent, and designated a new operator for the location.

119.     Despite having no lawful right to enter the premises, Scott returned to the Garners Ferry Location on at least two occasions—November 19, 2025, and December 2, 2025—without Liberty's consent.

120.     On or about December 2, 2025, upon information and belief, Scott obtained access to the Garners Ferry Location by presenting a void and superseded lease to a locksmith, thereby deceiving the locksmith into changing the locks and granting her unauthorized entry.

121.    Once inside, Scott removed desks, computers, customer files, filing cabinets, and other property belonging to Liberty, and changed the locks to exclude Liberty from its own premises.

122.    Scott's unauthorized entries and interference with the Garners Ferry Location constitute trespass under South Carolina or Virginia law.

123.    Scott's conduct was intentional and done with full knowledge that she no longer had any right to occupy or access the premises.

124.    As a direct and proximate result of Scott's trespass, Liberty has suffered harm, including the disruption of business operations, the loss of access to the premises, and the unauthorized removal of valuable property.

125.    Liberty does not seek damages for trespass at this time due to the automatic stay in Scott's bankruptcy. Instead, it seeks injunctive relief to prevent Scott from reentering the Garners Ferry Location or any other Liberty Tax premises without authorization.

126.    Liberty also seeks an order compelling Scott to return any keys, keycards, or access credentials to Liberty properties and to cease any further physical interference with Liberty's business locations or assets.

## **PRAYER FOR RELIEF**

WHEREFORE, Liberty respectfully prays that the Court enter judgment in its favor and grant the following relief:

1.    A preliminary and permanent injunction prohibiting Scott, and all those acting in concert with her, from using, disclosing, copying, or destroying Liberty's trade secrets and other Confidential Information—including customer lists, tax records, or other proprietary data—and requiring immediate preservation of such information pending return to Liberty.

2.      An order compelling Scott to return all Liberty property in her possession, including client tax returns, customer lists, client files, computers, storage devices, furniture, office equipment, and any documents or media containing Liberty's information. The Court may order Scott to deliver such property by a date certain or authorize Liberty to recover it, with law enforcement assistance if necessary.

3.      An order barring Scott from entering the Garners Ferry Location or any other Liberty office or accessing Liberty's systems without permission, and requiring her to surrender any keys, credentials, or passwords to Liberty's premises or systems. If she altered any access controls, she must restore or provide new access credentials at her expense.

4.      Authorization for expedited discovery to locate misappropriated data and property and identify any third parties in possession of, or involved in the use of, such data or property. The Court should further require Scott to submit any relevant personal devices for inspection and ensure secure deletion of any Liberty data following its return.

5.      Any additional relief the Court deems just and proper, including leave to seek monetary damages if the bankruptcy stay is lifted, and recovery of attorneys' fees and costs pursuant to the Franchise Agreement or applicable law.

Date:  December 17, 2025
Charleston, South Carolina

GORDON REES SCULLY MANSUKHANI LLP

*/s/ Peter G. Siachos*
Peter G. Siachos (Fed ID 07591)
677 King Street, Suite 450
Charleston, SC 29403
Telephone: (843) 714-2505
psiachos@grsm.com
*Attorneys for Plaintiff JTH Tax LLC d/b/a*
*Liberty Tax Service*